**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DOUGLAS WRIGHT,

     Plaintiff,

                            Case No. 16-12113

v.
                            Hon. Marianne O. Battani

CORIZON HEALTH, INC., BETSY
SPREEMAN, DR. KEITH PAPENDICK,
and DR. STEVEN BERGMAN,

     Defendants.

_____/

**OPINION AND ORDER GRANTING**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Douglas Wright commenced this action in this Court on June 9, 2016,

asserting claims under 42 U.S.C. § 1983 that the Defendant medical service provider,

Corizon Health, Inc., and three individual health care professionals — Defendants Betsy

Spreeman, Dr. Keith Papendick, and Dr. Steven Bergman — violated his rights under

the Eighth and Fourteenth Amendments to the U.S. Constitution by providing

inadequate medical treatment for a knee injury he sustained while incarcerated at a

prison facility operated by the Michigan Department of Corrections ("MDOC").

Specifically, Plaintiff alleges that after he suffered a severe injury to his left knee in April

of 2015, Defendants took insufficient steps to properly diagnose this injury, and then

prescribed inadequate treatment measures such as pain medication, exercise, and

physical therapy. Plaintiff further alleges that fifteen months passed before Defendants

finally sent him for an orthopedic consultation in July of 2016, and that he underwent

surgery shortly thereafter for repair of a torn medial meniscus.

Two motions presently are pending before the Court.  First, Defendant Corizon

Health and the two individual defendants employed by Corizon, Dr. Papendick and Dr.

Bergman (collectively the "Corizon Defendants"), seek an award of summary judgment

in their favor under Fed. R. Civ. P. 56, arguing (i) that the evidence marshaled by

Plaintiff fails to establish that either of the individual medical professionals acted with

deliberate indifference to Plaintiff's serious medical needs, as opposed to exercising

ordinary medical judgment, and (ii) that Plaintiff has not produced evidence that a

Corizon policy or practice caused a violation of his constitutional rights.  Next, the

remaining individual defendant named in Plaintiff's complaint — Betsy Spreeman, an

MDOC employee who worked at the prison facility where Plaintiff was confined in 2015

— also moves for summary judgment, contending that her minimal involvement in

Plaintiff's medical treatment cannot support a claim that she was deliberately indifferent

to Plaintiff's serious medical needs.

Defendants' two motions have been fully briefed by the parties.  Having carefully

reviewed the parties' submissions in support of and in opposition to Defendants'

motions, as well as the remainder of the record, the Court has determined that it is

appropriate to decide these motions without a hearing.  *See* Local Rule 7.1(f)(2),

Eastern District of Michigan.  For the reasons set forth below, the Court **GRANTS**

Defendants' motions for summary judgment.


## II.	FACTUAL BACKGROUND

In April of 2015, Plaintiff Douglas Wright was incarcerated at MDOC's Lakeland Correctional Facility ("LCF"), serving a lengthy sentence for second-degree murder. He was 62 years old at the time. Defendant Corizon Health, Inc., has a contractual arrangement with MDOC to provide medical care to inmates at LCF and other MDOC facilities.

On April 12, 2015, Plaintiff visited LCF's medical clinic, stating that he was walking outside when something snapped in his left knee and he fell to the ground. (*See* Dkt. 69, Corizon Defendants' Motion, Ex. A, Medical Record at 246; *see also* Dkt. 79, Plaintiff's Response, Ex. 1, Plaintiff's Dep. at 5.) He was seen by a nurse, who noted his complaint that he could not "bend [his] knee flat," and also observed that he was "very unsteady" when he attempted to walk with crutches. (Medical Record at 246.) Plaintiff was instructed to use a wheelchair, and was given a temporary no-work assignment and a five-day restriction on his activities. (*See id.* at 246-48.)

On April 15, 2015, Plaintiff's primary medical provider at LCF, physician's assistant ("P.A.") Kyle Sperling, reviewed Plaintiff's chart and ordered acetaminophen and ibuprofen for pain, as well as an x-ray of Plaintiff's knee to be taken the next day. (*See id.* at 241-42.)[1] The x-ray was read by Russell Gelormini, D.O., who found "no fracture or dislocation," no "significant degenerative disease," a "normal pattern of osseous mineralization," and "normal" soft tissues. (*Id.* at 876.) Dr. Gelormini concluded that the exam was "[n]ormal." (*Id.*) P.A. Sperling then examined Plaintiff on

---

[1]P.A. Sperling was named as a defendant in Plaintiff's initial complaint, but the claims against him were dismissed without prejudice in a stipulated order dated September 12, 2017.

April 17, observing that Plaintiff was experiencing "swelling and stiffness" in his left knee and stating that he "[s]uspected medi[]al meni[s]cal involvement and MCL involvement," although Plaintiff's "lig[a]ments [we]re intact at this time." (*Id.* at 233.) He added an Ace bandage to Plaintiff's treatment, as well as crutches and a wheelchair for long distances, and ordered an additional pain medication to be taken for the next five days. (*Id.* at 233-34.)[2]

Over the next several months, Plaintiff was repeatedly seen by medical personnel at LCF, primarily P.A. Sperling, and the treatment for his knee injury

---

[2]In an affidavit accompanying Plaintiff's response to the Corizon Defendants' motion, Plaintiff states that he "again saw [P.A.] Sperling" a few days later, on April 22, and that "he told me that I should be walking on my knee in a couple weeks." (Plaintiff's Response, Ex. 3, Plaintiff's Aff. at ¶ 10.) Plaintiff contradicts this assertion in his response brief, however, stating that after he saw P.A. Sperling on April 17, he was "not allowed to see Sperling again until June 2," despite "repeated complaints and requests." (Plaintiff's Response Br. at 3.)

More generally, the Corizon Defendants note that Plaintiff's affidavit is problematic in a number of respects. First, "it is rife with inadmissible hearsay," (Dkt. 80, Corizon Defendants' Reply Br. at 3), such as Plaintiff's above-cited statement about the assurance he received from P.A. Sperling during his April 22 visit. *See* Fed. R. Civ. P. 56(c)(4) (mandating that an affidavit "used to support or oppose a [summary judgment] motion must . . . set out facts that would be admissible in evidence"); *see also Sperle v. Michigan Department of Corrections,* 297 F.3d 483, 495 (6th Cir. 2002) ("A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact."). Next, when Plaintiff cites this affidavit in his response to the Corizon Defendants' motion, he does not direct the Court to any particular paragraphs in the affidavit, but instead relies on the Court to search through the entirety of his 15-page, 72-paragraph submission to identify the statements that might be relevant to the proposition he seeks to establish. *See* Fed. R. Civ. P. 56(c)(1)(A) (requiring a party to support the assertions in a summary judgment brief by "citing to particular parts of materials in the record"). Finally, Plaintiff signed this affidavit on September 10, 2018, after he was deposed in discovery and after the Corizon Defendants filed their present motion. *See Penny v. United Parcel Service,* 128 F.3d 408, 415 (6th Cir. 1997) ("[A] party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony.").

remained conservative. On June 2, 2015, for instance, P.A. Sperling saw Plaintiff for his knee injury and another condition, and he noted that Plaintiff "denie[d] new injuries, falls, instability, or assaults since [his] April fall while walking." (Medical Record at 210.) Upon examining Plaintiff, P.A. Sperling observed that he "ambulate[d] into [the] clinic with [left] knee limp" and that the knee was "slightly swollen," but he opined that Plaintiff's knee was "stable at this time." (*Id.*) P.A. Sperling further noted that Plaintiff "refuses to use crutches" and that he arrived at the clinic "without crutches or [a] wheelchair," and he "encouraged [Plaintiff] to use crutches" and avoid "continued weight bearing" on his left knee, explaining that the knee "needs time to heal [and] bearing weight will continue to aggr[a]vate it." (*Id.* at 211.) Plaintiff "request[ed] to have a 'scan' done of [his] knee," but P.A. Sperling responded that he would "need to comply w[ith] medical recommendations before further imaging or scans will be considered." (*Id.*) In the meantime, Plaintiff's pain medications were continued. (*See id.*)

On June 10, 2015, Plaintiff had his sole clinical visit with Defendant Betsy Spreeman, an MDOC employee and registered nurse who served as the health unit manager at LCF. Plaintiff reported that he suffered "aching pain [in his knee] in [the] morning and sometimes sharp pains in [the] afternoon," and Ms. Spreeman found on examination that Plaintiff had a "bruise like color on [the] inner part of [his] left knee" but "[m]inimal swelling," "[n]o decrease in strength," and range of motion and gait within normal limits. (*Id.* at 206.) According to Plaintiff, Ms. Spreeman took his crutches away and gave him a shorter pair so that he would "start putting more weight on" his knee. (Plaintiff's Dep. at 20, 29-30.) These shorter crutches did not provide the necessary stability, however, causing Plaintiff's knee to "lock up" and leading him to fall

"[n]umerous times." (*Id.* at 29-30.) Plaintiff also told Ms. Spreeman that the pain medications ordered for him "were not working," but she advised him to "take extra doses of whatever [he] had" and generally "did everything she could to brush . . . off" his complaints of pain and discomfort. (*Id.* at 21, 28.)

At Plaintiff's clinic visit on July 2, 2015, P.A. Sperling noted that Plaintiff had arrived on crutches, and that he had been unable to "walk without assistance for the past 3-4 months." (Medical Record at 197.) He further noted Plaintiff's report that he had fallen "on 3 sep[a]rate occasions" while using his crutches. (*Id.*) On examination, P.A. Sperling found (i) that Plaintiff's knee was "slightly swollen," (ii) that he experienced "[a]pprehension . . . with McMurray test," (iii) that "laxity [and] tenderness" was observed in a varus stress test, and (iv) that there were "limitations with full extension and flexion." (*Id.*) P.A. Sperling requested an orthopedic consultation, (*see id.* at 193), and this request was reviewed by Defendant Keith Papendick, M.D., who served at the time as medical director of utilization management for Defendant Corizon's Michigan division. (*See id.* at 194; *see also* Plaintiff's Response, Ex. 8, Papendick Dep. at 8, 11.)[3]  Dr. Papendick determined that the "[m]edical necessity" for an orthopedic consult was "not demonstrated at this time," and he instead recommended an alternative treatment plan ("ATP") consisting of "quadriceps muscle strengthening/toning exercise to treat . . . [p]atellofemoral syndrome." (Medical Record at 194.) As Plaintiff observes, however,

---

[3]Dr. Papendick acknowledged that in his utilization management role, he did not conduct examinations of patients, but instead reviewed their medical records. (*See* Papendick Dep. at 39.) It is undisputed that Dr. Papendick never examined Plaintiff.

there is no indication in the record that any medical service provider ever diagnosed Plaintiff as suffering from this condition.

Based on Dr. Papendick's recommendation, P.A. Sperling requested a physical therapy consult to evaluate Plaintiff's knee. (*See id.* at 186.) Dr. Papendick approved this request, and Plaintiff was sent for "evaluation, development and training for [a] home exercise program directed towards" Plaintiff's knee symptoms. (*Id.* at 184.) A physical therapist performed this evaluation on July 30, 2015, and determined that Plaintiff had a "fair" potential for rehabilitation of his knee. (*Id.* at 178-79.) Plaintiff was given an "extensive" home exercise program to strengthen his knee, and was advised to follow up with his primary medical service provider if his condition did not improve within eight weeks. (*Id.* at 179.) Although Plaintiff complained a few days later that his left leg was "painful" after performing these exercises, (*id.* at 176), P.A. Sperling advised him at an August 14 clinic visit that he should continue with the home exercise program recommended by the physical therapist, and that he should return to the clinic in September when he had nearly completed this two-month program, (*see id.* at 164-65.)

Prior to this September visit with P.A. Sperling, Plaintiff filed a series of kites protesting the inadequacy of the treatment of his knee injury. On August 17, 2015, for example, Plaintiff noted that he had previously complained about falls while using his crutches due to "pain attacks" in his left knee, and he stated that he had fallen "again today adding pain to other areas [due to] the fall." (*Id.* at 163.) In response, Plaintiff was reminded that "at [his] medical provider visit three days ago, [he] w[as] advised to continue the physical therapy given to [him] for another month," when he would "seen again by the medical provider." (*Id.*) Plaintiff was offered a "nurse evaluation" because

his August 17 "kite indicate[d] a possible new injury and different pain," (*id.*), but Plaintiff responded in a subsequent kite that "I DO NOT have a new injury or different pain" and thus he did not "wish to see a nurse," (*id.* at 162). Instead, he emphasized that his complaint arose from his April 12 knee injury that "ha[d] yet to be properly diagnosed or property treated." (*Id.*) Similarly, in an August 25 kite, Plaintiff characterized the offer of a nurse evaluation as "an attempt at humor," and he opined that a nurse visit would do nothing to address his "constant" pain because a nurse would be unable to authorize the MRI or surgery that Plaintiff believed was warranted. (*Id.* at 159; *see also id.* at 153 (Plaintiff states in September 8 kite that he was "appalled" by the responses to his prior kites, where his next provider visit was not scheduled until later that month and he was suffering "constant left knee pain" in the meantime); *id.* at 152 (Plaintiff reports in September 14 kite that the exercises he was "given to strengthen [his] quadr[i]cep [and] make [his] left knee usable and less painful" were not working "so far").)

Plaintiff next saw P.A. Sperling on September 23, 2015. (*See id.* at 146-47.) Following his exam of Plaintiff, P.A. Sperling noted that Plaintiff had undergone "physical therapy approxi[ma]tely 2 months ago without benefit or sign[i]ficant improv[e]ments." (*Id.* at 147.) He diagnosed Plaintiff as suffering from derangement of the medial meniscus and requested an MRI of Plaintiff's left knee, "given 4-5 months of inability to walk on knee and McMurray sign pos[i]tive." (*Id.*) Dr. Papendick denied this request, however, stating that the "[m]edical necessity" for an MRI was "not demonstrated at this time," and instead recommending "knee extensor and flexor strengthening exercises . . . four times daily," to be performed in the health care unit to ensure Plaintiff's compliance. (*Id.* at 143.) In Defendants' view, this need to monitor

Plaintiff's compliance with his exercise program was confirmed in an October 17, 2015 chart review, in which P.A. Sperling stated that he was "informed by [the health utilization manager] that [Plaintiff] was seen with single crutch use and double crutch under one arm use while in the yard." (*Id.* at 134.) Plaintiff was advised at that time "to start using [his] crutches properly and toe touch on side of affected knee as tolerated until a [followup] visit could be scheduled in the near future." (*Id.*)

On October 22 and 28, 2015, P.A. Sperling again requested MRIs of Plaintiff's knee. (*See id.* at 114, 127.) Before making the second of these requests, P.A. Sperling reported that he had "received contact from [MDOC's chief medical officer] to appeal for [an] MRI of [Plaintiff's] knee," in order to secure a diagnosis and enable Plaintiff's treatment to "move forward." (*Id.* at 117.) Once again, however, Dr. Papendick denied these two requests for lack of "[m]edical necessity." (*Id.* at 113, 126.) In response to the first of these requests, Dr. Papendick recommended that P.A. Sperling should "[c]onsider scheduling and restricting NSAIDS and acetaminophen to demonstrate compliance," as well as "changing to a different formulary NSAID every 90 days." (*Id.* at 126.) As for the second request, Dr. Papendick opined that an "X[-]ray of the knee [was] necessary prior to [an] MRI." (*Id.* at 113.)

This recommended x-ray was performed on November 4, 2015, and the radiologist who read this x-ray, Dr. Uchendu Azodo, reported that "[d]egenerative changes [we]re present" and were "new" since the last x-ray back in April. (*Id.* at 875.) Thus, Dr. Azodo diagnosed Plaintiff's condition as left knee arthritis. (*Id.* at 875.) In the wake of these new findings, Dr. Papendick approved an MRI of Plaintiff's left knee on November 9, 2015. (*See id.* at 104.) This MRI was performed on December 1, 2015,

with findings of (i) "[t]orn and macerated posterior horn and body of medial meniscus with adjacent posterior capsular sprain," (ii) "[s]ubarticular insufficiency fracture medial femoral condyle superimposed over medial compartment arthritic change," (iii) "[g]rade III to IV chondromalacia patella with moderate to large joint effusion," and (iv) MCL bursitis, prepatellar bursitis." (*Id.* at 874.)

On December 9, 2015, P.A. Sperling requested an orthopedic consult in light of the "significant" findings from the MRI. (*Id.* at 93.) The next day, P.A. Sperling received a phone call from Dr. Papendick, asking him to conduct research regarding the stress fracture revealed in the MRI before submitting his request for an orthopedic consult. (*See id.* at 90.) P.A. Sperling's research revealed that Plaintiff should "remain non-weight bearing" on his injured knee "for at least 6 weeks." (*Id.*) This advice was conveyed to Plaintiff, and he was instructed to use crutches or a wheelchair for six weeks and to cease his exercise program. (*See id.*) P.A. Sperling indicated that further imaging would be ordered in six weeks to determine the status of Plaintiff's stress fracture, and that a request for an orthopedic consult would be revisited at that time "once [the] stress [f]racture has improved or healed." (*Id.*) P.A. Sperling acknowledged that Plaintiff's "torn and macerated meniscus still needs to be addressed," but opined that this could not "take place before healing of the stress [fracture]." (*Id.*)

Another x-ray was taken of Plaintiff's knee on January 20, 2016, with Plaintiff filing another series of kites in the interim complaining of continued pain and a lack of effective treatment of his knee injury. (*See, e.g., id.* at 81 (Plaintiff's January 3, 2016 kite stating that "[s]ince 4/12/15, I've been waiting for [the health care unit] to treat my injured left knee," and that it "apparently . . . is [the unit's] depraved plan" that he

continue to suffer "horrible" pain); *id.* at 75 (Plaintiff's January 15, 2016 kite reporting "[a]nother pain filled day" and complaining that it had been "[n]ine months [and] still waiting for my left knee to be treated").)  The x-ray revealed "narrowing of the joint space due to modest degenerative changes" and "modest degenerative spurring involving tibial spine and femoral condyles," but "[n]o fracture or dislocation."  (*Id.* at 870.)  The next day, P.A. Sperling reviewed the results of the x-ray with Plaintiff, and advised him to "continue with [his] crutches and to remain non-weight bearing."  (*Id.* at 72-73.)  P.A. Sperling further indicated that he would consider additional measures to treat Plaintiff's knee during his next scheduled visit.  (*See id.* at 73.)

    After this second x-ray, Corizon's regional medical director, Defendant Steven Bergman, D.O., became involved in Plaintiff's treatment.  (*See id.* at 64; *see also* Plaintiff's Response, Ex. 5, Bergman Dep. at 13.)  On or around February 16, 2016, P.A. Sperling contacted Dr. Bergman to express his view that the "conservative therapy" used for Plaintiff's knee injury was "not working as well as he would have liked," and to inquire about the "next appropriate step" in this treatment.  (Bergman Dep. at 13; *see also* Medical Record at 64.)  As a result of this conversation, P.A. Sperling requested another MRI of Plaintiff's knee.  (Medical Record at 64-65; *see also* Bergman Dep. at 22.)  Dr. Papendick denied this request for a follow-up MRI, however, determining that it was not medically necessary, and recommending instead that Plaintiff's condition should be "follow[ed] in [the] on site clinic" and that he should complete "quad extensor exercises . . . in front of nursing four times daily."  (Medical Record at 66.)

    Plaintiff was next seen by P.A. Sperling on March 23, 2016, (*see id.* at 45-46), and then about two weeks later, on April 8, (*see id.* at 39-40).  At this latter visit, P.A.

Sperling reported that as a result of his continued communications with Dr. Bergman, it had been determined that Plaintiff would be transferred to Duane Waters Hospital for inpatient physical therapy. (*See id.* at 39; *see also* Bergman Dep. at 25-26.) In connection with this treatment plan, Plaintiff was transferred from LCF to the G. Robert Cotton Correctional Facility, and he was seen by physical therapist Scott J. Weaver on April 26, 2016. (*See* Medical Record at 19-21, 24.) Weaver assessed Plaintiff's rehabilitation potential as "[p]oor," noting that "[h]is MRI reveals significant dera[n]gement of medial meniscus," but he stated that "[w]e will attempt 2 months of [physical therapy] to see if a conservative approach will work." (*Id.* at 20.)

In Plaintiff's view, this course of action meant that he "suffered two more months of severe pain caused by physical therapy with no improvement." (Dkt. 79, Plaintiff's Response Br. at 13-14.) According to the Corizon Defendants, however, the record demonstrates Plaintiff's lack of compliance with his physical therapy treatment plan. On May 17, 2016, for example, physical therapist Kim Kosman noted Plaintiff's report that "he is non weight bearing on" his left leg, but observed that Plaintiff had been "putting weight on [this leg] since arriving to therapy" and "wacking] short distances without [his] crutches." (Medical Record at 2; *see also id.* at 1229 (Kosman's May 19, 2016 treatment record notes Plaintiff's assertion that "he is non weight bearing" but states that Plaintiff "walks in the therapy room without his crutches bearing a significant amount of weight" on his left leg).) At a later session, Kosman cited Plaintiff's complaint that "therapy is not helping and that he thinks it is making it worse," but she reported that he "seemed] to be tolerating" the physical therapy and "did] not complain of pain during his exercises." (*Id.* at 1217.)

Regardless of these factual disputes, all are agreed that Plaintiff's condition showed "little to no improvement" as a result of the two-month course of physical therapy. (*Id.* at 1209.) Accordingly, Plaintiff's medical provider at his new facility, Dr. Charles Jamsen, requested a consultation for orthopedic surgery, and Dr. Papendick approved this request. (*See id.* at 1207-10.) Dr. Khawaja Ikram, D.O. examined Plaintiff on July 27, 2016 and recommended that he undergo an "arthroscopic medial meniscectomy with chondroplasty of the left knee." (*Id.* at 762-63.) Dr. Papendick approved this recommendation, (*see id.* at 1179-80), and on August 11, 2016, Dr. Ikram performed arthroscopic surgery on Plaintiff's left knee, (*see id.* at 760-61).

## III.    STANDARD OF REVIEW

Through the present pair of motions, the Corizon Defendants and Defendant Betsy Spreeman seek awards of summary judgment in their favor on each of the claims asserted against them in Plaintiff's first amended complaint. Under the pertinent Federal Rule governing these motions, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence "in a light most favorable to the party opposing the motion, giving that party the benefit of

13

all reasonable inferences." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir. 2007). Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "[a] mere scintilla of evidence is insufficient" to withstand a summary judgment motion; rather, "there must be evidence on which the jury could reasonably find for the non-moving party." *Smith Wholesale,* 477 F.3d at 861 (internal quotation marks and citation omitted).

IV.    **ANALYSIS**

    A.    **Plaintiff Has Failed to Raise a Genuine Issue of Material Fact as to the Eighth Amendment Claims Asserted Against the Three Individual Defendants.**

In Count III of his first amended complaint, Plaintiff has asserted claims under 42 U.S.C. § 1983 against each of the three individual Defendants, alleging that these three medical service providers violated his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution by failing to "provide him with appropriate and reasonable medical care." (Dkt. 17, First Amended Complaint at ¶ 53.) In their present motions, Defendants argue that they are entitled to summary judgment in their favor on

these § 1983 claims, where the record, in their view, fails as a matter of law to demonstrate that they acted with the deliberate indifference that is required to establish an Eighth Amendment violation.  As discussed below, the Court agrees.

### 1.    Applicable Law

The Eighth Amendment to the U.S. Constitution protects against the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, and this prohibition is "made applicable to the States by the Fourteenth" Amendment, *Estelle v. Gamble,* 429 U.S. 97, 101, 97 S. Ct. 285, 289 (1976) (footnote omitted).  In the context of the government's obligation to provide medical care to prison inmates, the Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain," and thus is "proscribed by the Eighth Amendment."  *Estelle,* 429 U.S. at 104, 97 S. Ct. at 291 (internal quotation marks and citation omitted).  "Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983."  429 U.S. at 105, 97 S. Ct. at 291.

The Supreme Court has emphasized, however, that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment," and that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."  429 U.S. at 105-06, 97 S. Ct. at 291-92.  Rather, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  429 U.S. at 106, 97 S. Ct. at 292.  This deliberate indifference standard, in turn, has objective and subjective components.  *See Farmer v. Brennan,* 511 U.S. 825, 834,

114 S. Ct. 1970, 1977 (1994); *Miller v. Calhoun County,* 408 F.3d 803, 812 (6th Cir.

2005).  The objective component of this standard "requires the existence of a sufficiently

serious medical need."  *Blackmore v. Kalamazoo County,* 390 F.3d 890, 895 (6th Cir.

2004) (internal quotation marks and citations omitted).  To establish the subjective

component of an Eighth Amendment claim of inadequate medical care, an inmate must

"show that prison officials have a sufficiently culpable state of mind in denying medical

care."  *Blackmore,* 390 F.3d at 895 (internal quotation marks and citations omitted).

      **2.**      **The Record Put Forward by Plaintiff Fails to Establish the
Objective Component of the Deliberate Indifference Standard.**

Turning first to the objective prong of the deliberate indifference inquiry, the Sixth

Circuit recently described the different means through which a plaintiff may satisfy this

standard:

> The objective component requires a plaintiff to prove that the
> alleged deprivation of medical care was serious enough to violate the
> Eighth Amendment.  Sometimes this inquiry is a simple one.  For
> example, because a serious medical condition carries with it a serious
> medical need, when prison officials fail to provide treatment for an
> inmate's serious medical condition, the inmate has endured an objectively
> serious deprivation.  So we have said that when an inmate had a medical
> need diagnosed by a physician as mandating treatment, the plaintiff can
> establish the objective component by showing that the prison failed to
> provide treatment, or that it provided treatment so cursory as to amount to
> no treatment at all.
>
> But when an inmate has received on-going treatment for his
> condition and claims that this treatment was inadequate, the objective
> component of an Eighth Amendment claim requires a showing of care so
> grossly incompetent, inadequate, or excessive as to shock the conscience
> or to be intolerable to fundamental fairness.  The plaintiff must present
> enough evidence for a factfinder to evaluate the adequacy of the
> treatment provided and the severity of the harm caused by the allegedly
> inadequate treatment.

*Rhinehart v. Scutt,* 894 F.3d 721, 737 (6th Cir. 2018) (internal quotation marks and citations omitted).

In this case, Plaintiff's knee injury was diagnosed by health care providers as necessitating treatment. Moreover, treatment was in fact provided for this condition, albeit not the particular form of treatment that Plaintiff evidently desired. As indicated in the above-quoted passage, the Sixth Circuit has "distinguish[ed] between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Alspaugh v. McConnell,* 643 F.3d 162, 169 (6th Cir. 2011) (internal quotation marks and citation omitted). In *Santiago v. Ringle,* 734 F.3d 585, 591 (6th Cir. 2013), for example, the plaintiff inmate "complain[ed] that he was delayed in receiving a *specific type* of medical treatment" for a skin condition, and the court construed these allegations as "disput[ing] the adequacy of the treatment he received during that period." In such a case "involving a claim based on the prison's failure to treat a condition adequately," the plaintiff inmate must "submit medical proof that the provided treatment was not an adequate medical treatment of his condition or pain." *Santiago,* 734 F.3d at 591; *see also Rhinehart,* 894 F.3d at 737; *Blackmore,* 390 F.3d at 898.

In Defendants' view, Plaintiff's Eighth Amendment claim in this case rests upon allegations of inadequate treatment of his knee injury, and not an outright failure to treat this condition or treatment so cursory as to amount to no treatment at all. It follows, according to Defendants, that Plaintiff must produce medical proof that would enable a trier of fact to "evaluate the adequacy of the treatment provided [to him] and the severity of the harm caused by the allegedly inadequate treatment." *Rhinehart,* 894 F.3d at 737.

"This will often require expert medical testimony showing the medical necessity for the desired treatment and the inadequacy of the treatments the inmate received." *Rhinehart,* 894 F.3d at 737-38 (internal alterations, quotation marks, and citations omitted). Plaintiff "also must place verifying medical evidence in the record to establish the detrimental effect of the inadequate treatment." 894 F.3d at 738 (internal quotation marks and citations omitted).

In this case, the Corizon Defendants have produced the report of an orthopedic expert, Paul Drouillard, D.O., stating that the conservative treatment provided for Plaintiff's knee injury was "reasonable and appropriate" in light of the "chronic, degenerative" nature of Plaintiff's condition. (*See* Corizon Defendants' Motion, Ex. B, Drouillard Report at 1.) Although the Court may not uncritically accept this expert opinion over contrary evidence in resolving Defendants' summary judgment motions, Plaintiff has not suggested any basis for challenging Dr. Drouillard's reading of the medical record. In particular, he has not proffered the testimony of a medical expert or other medical proof that, if credited over Dr. Drouillard's report, would permit a trier of fact to conclude that the ongoing conservative treatment of his knee injury was "so grossly incompetent [or] inadequate . . . as to shock the conscience or to be intolerable to fundamental fairness." *Rhinehart,* 894 F.3d at 737 (internal quotation marks and citations omitted). Indeed, Plaintiff does not point to any evidence that would enable a trier of fact to assess the adequacy of this conservative treatment and determine whether it satisfied or fell short of the governing Eighth Amendment standard for inmate medical care. Consequently, he cannot establish the objective prong of his § 1983 claim of deliberate indifference to his serious medical needs.

18

In an effort to avoid this conclusion, Plaintiff first contends that he is exempt from the requirement that he produce "medical proof" of the inadequacy of Defendants' treatment of his knee injury, where this injury was so "obvious" as to demonstrate a serious medical need without resort to supporting medical evidence. (*See* Plaintiff's Response Br. at 21.) In support of this assertion, Plaintiff relies principally on the Sixth Circuit's decision in *Blackmore, supra*. In that case, the plaintiff pretrial detainee, Tjymas Blackmore, complained of abdominal pain and requested medical care "[w]ithin an hour of his arrival" at the Kalamazoo County Jail. *Blackmore,* 390 F.3d at 894. When Blackmore continued to complain of abdominal pain over the next 36 hours, "jail officials gave [him] antacids, but did not otherwise secure medical care," and a subsequent entry in the jail log disclosed that Blackmore had vomited, that the antacids had not helped, and that he continued to report "sharp" abdominal pains. 390 F.3d at 894. At that point, Blackmore was moved to an observation cell but still was not provided with any medical treatment. 390 F.3d at 894. Eventually, "over two complete days after his first complaint of pain," Blackmore was examined by a jail nurse who "diagnosed him as showing classic signs of appendicitis," and he was immediately transported to a local hospital for an appendectomy. 390 F.3d at 894 (internal quotation marks and citation omitted).

Against this backdrop, the Sixth Circuit found that Blackmore's claim of deliberate indifference was properly analyzed under the court's prior decisions addressing "obvious" medical needs, and that he therefore was not required to "present verifying medical evidence" to establish the objective component of this claim. 390 F.3d at 899-900. In so ruling, the court explained that Blackmore had "exhibited obvious

19

manifestations of pain and injury" through (i) his "complain[ts] of 'sharp' and 'severe' stomach pains for an extended period of time," and (ii) his vomiting, which was "a clear manifestation of internal physical disorder." 390 F.3d at 899. Moreover, the record indicated that "[t]he jailers deemed Blackmore's condition sufficiently serious to place him in an observation cell." 390 F.3d at 899. In light of this evidence, the court reasoned that "a jury could reasonably find that Blackmore had a serious need for medical care that was so obvious that even a layperson would easily recognize the necessity for a doctor's attention." 390 F.3d at 899 (internal quotation marks and citation omitted). As explained by the court, "[w]hen prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity." 390 F.3d at 899. Although the defendant jail officials questioned whether the evidence established that Blackmore suffered actual harm as a result of the delayed treatment of his condition, the court found it "sufficient that the officers' delay in treatment of an obvious medical emergency posed a substantial risk of serious harm to Blackmore by subjecting him to unnecessary infliction of pain." 390 F.3d at 899.

In Plaintiff's view, the analysis in *Blackmore* should likewise govern here, where the record is clear that he "suffered a traumatic injury that immediately caused him to need crutches" and also caused "severe pain." (Plaintiff's Response Br. at 21.) Yet, while the Court agrees that Plaintiff indisputably suffered an injury that necessitated medical treatment — and indeed, as observed earlier, the existence and seriousness of this medical need were confirmed through the diagnoses and treatment notes of the

20

health care providers who examined Plaintiff in the wake of his injury — the circumstances here nonetheless differ in one important respect from those addressed in *Blackmore*. Specifically, the claim in that case rested upon a "delay in treatment of an obvious medical emergency," and the court emphasized that in such a case, the plaintiff may establish his claim by "show[ing] that he actually experienced the need for medical treatment, ***and*** that the need was not addressed within a reasonable time frame." *Blackmore,* 390 F.3d at 899-900 (emphasis added).

Here, in contrast, even if Plaintiff's claim could generally be viewed as involving a delay in treatment, it is more accurately characterized as arising from a delay in the particular type of treatment sought by Plaintiff — orthopedic surgery — while his health care providers instead prescribed conservative measures such as crutches, physical therapy, exercise, and pain medications. Most notably, in the immediate aftermath of Plaintiff's knee injury, his primary medical provider, P.A. Sperling, examined his knee, ordered an x-ray, restricted his activities, and prescribed an Ace bandage, crutches, a wheelchair, and pain medication. Over the following months, Plaintiff was repeatedly seen by P.A. Sperling and other health care providers, who supplemented this conservative treatment with such measures as (i) more x-rays and an MRI, (ii) physical therapy evaluations and exercise programs, and (iii) inpatient physical therapy. To be sure, Plaintiff maintains that this course of treatment was wholly inadequate, and that surgery was warranted far earlier than it was eventually provided, but he cannot claim that he was altogether denied any treatment for his knee condition.

As explained earlier, the Sixth Circuit has consistently viewed claims of this sort as challenging the adequacy of the treatment provided for a medical need, and has

21

insisted that such challenges must be supported by "medical proof that the provided treatment was not an adequate medical treatment of [the plaintiff inmate's] condition or pain." *Santiago,* 734 F.3d at 591; *see also Rhinehart,* 894 F.3d at 737-38. Indeed, the Sixth Circuit has explicitly found *Blackmore* distinguishable in cases where, as here, the plaintiff received treatment for a medical condition but complained either that this treatment was inadequate or that there was a delay in providing a specific, preferred type of treatment. *See King v. Alexander,* No. 13-4287, 574 F. App'x 603, 606 (6th Cir. July 25, 2014) (finding that *Blackmore* was not controlling where the plaintiff's claim "stem[med] from the alleged inadequacy of her medical treatment in jail, not from a complete absence of medical care," and where this claim rested in part on "an unrequited request for a specific type of medical treatment"); *Blosser v. Gilbert,* No. 09-2353, 422 F. App'x 453, 460 (6th Cir. May 10, 2011) (explaining that the "obviousness standard" addressed in *Blackmore* "is primarily applicable to claims of denial or delay of *any* treatment rather than claims that a plaintiff was denied or delayed in receiving a *specific type* of medical treatment"); *Cain v. Irvin,* No. 07-6080, 286 F. App'x 920, 927 (6th Cir. July 17, 2008) (distinguishing *Blackmore* as addressing a situation in which an inmate with an "obvious" need for medical care was subjected to a "delay in treatment [that] presented a serious, if not fatal, risk to [his] health"). Accordingly, the Court cannot accept Plaintiff's appeal to *Blackmore* as obviating the need for medical proof in order to establish the objective component of his claim of deliberate indifference.

Plaintiff next suggests that he has, in fact, provided the medical evidence demanded under the Sixth Circuit precedent governing claims of inadequate medical treatment. Specifically, he points to (i) his ongoing complaints to medical staff at LCF

that he continued to suffer knee pain despite the treatment he was provided, (*see, e.g.,* Medical Record at 152, 159, 163); (ii) the recognition of his primary medical provider, P.A. Sperling, that the conservative treatment of Plaintiff's knee injury did not appear to be working, and P.A. Sperling's corresponding requests for additional measures such as orthopedic consults and MRIs, (*see, e.g., id.* at 93, 127, 146-47, 193, 197); and (iii) x-ray and MRI results indicating, in Plaintiff's view, that his condition was worsening over time in the absence of proper treatment, (*see id.* at 873-76).

To be sure, this record supports Plaintiff's contention that the conservative treatment of his knee injury did not work. What it does not show, however, is that the course of treatment advocated by Plaintiff would have produced a better outcome — and, in fact, Defendants' orthopedic expert, Dr. Drouillard, has opined to the contrary. (*See* Drouillard Report at 1 (stating that the arthroscopic surgery that was performed on Plaintiff's knee in August of 2016 was "probably not going to solve his problem, as his issues are degenerative in nature").) In Plaintiff's view, this difference of opinion about the efficacy of different forms of treatment raises a "factual conflict" that must be left for the trier of fact to resolve. (Plaintiff's Response Br. at 22 n.3.)

Yet, in order to withstand summary judgment and present this question about the efficacy of his treatment to the trier of fact, Plaintiff must point to evidence that would permit this purported "factual conflict" to be resolved in his favor. Where, as here, an Eighth Amendment claim rests not on an outright denial of treatment, but instead on a challenge to the adequacy of the treatment provided to an inmate for a serious medical need, the Sixth Circuit has insisted that the inmate "must place verifying medical evidence in the record to establish the detrimental effect" of the allegedly inadequate

treatment he was provided.  *Santiago,* 734 F.3d at 590 (internal quotation marks and citation omitted).  "[A] desire for additional or different treatment does not by itself suffice to support an Eighth Amendment claim," and "[t]his is particularly the case when a plaintiff fails to provide expert medical testimony . . . showing the medical necessity for such a treatment."  *Anthony v. Swanson,* No. 16-3444, 701 F. App'x 460, 464 (6th Cir. July 14, 2017).

The record here lacks the requisite "verifying medical evidence" that would enable a trier of fact to conclude that the treatment provided for Plaintiff's knee injury was so inadequate as to satisfy the objective prong of the deliberate indifference standard — that is, that this treatment was "so grossly incompetent[] [or] inadequate . . . as to shock the conscience or to be intolerable to fundamental fairness."  *Rhinehart,* 894 F.3d at 737 (internal quotation marks and citations omitted).  While Plaintiff points to medical evidence that his knee injury did not respond to the conservative treatment provided by LCF's medical personnel, the "mere failure to provide adequate medical care to a prisoner" does not, by itself, establish an Eighth Amendment violation, *Rhinehart,* 894 F.3d at 737, and "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," *Estelle,* 429 U.S. at 106, 97 S. Ct. at 292.  Absent medical evidence of the necessity of the alternative treatment sought by Plaintiff, such that a trier of fact could meaningfully evaluate this desired alternative against the more conservative treatment he actually received, *see Anthony,* 701 F. App'x at 464, the trier of fact would be left with the impermissible task of "second guess[ing] medical judgments" about the appropriate treatment of Plaintiff's knee condition, *Alspaugh,* 643 F.3d at 169 (internal quotation marks and citation

omitted); *see also Rhinehart,* 894 F.3d at 741 (finding that the plaintiffs in that case had

"shown only a desire for a more aggressive treatment," but had "failed to introduce the

requisite evidence for a jury to find that this treatment was necessary").  Accordingly,

the Court concludes that Plaintiff has failed to produce the medical evidence demanded

under Sixth Circuit precedent to satisfy the objective component of his Eighth

Amendment challenge to the adequacy of the treatment he received for his knee injury.

> **3.      Plaintiff Cannot Show That Any of the Individual Defendants Consciously or Recklessly Exposed Him to an Excessive Risk of Serious Harm.**

Even assuming Plaintiff could establish the objective prong of his Eighth

Amendment claim of deliberate indifference, he also would have to satisfy the subjective

component of the deliberate indifference standard for each of the individual health care

professionals named as defendants in his complaint.  In its recent *Rhinehart* decision,

the Sixth Circuit addressed the proof necessary to make this showing:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference.  Instead, the plaintiff must show that each defendant acted with a mental state equivalent to criminal recklessness.  This showing requires proof that each defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk by failing to take reasonable measures to abate it.

> A plaintiff may rely on circumstantial evidence to prove subjective recklessness:  A jury is entitled to conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.  And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.

> But the plaintiff also must present enough evidence from which a jury could conclude that each defendant so recklessly ignored the risk that he was deliberately indifferent to it.  A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the

outcome of the treatment is insufficient or even harmful.  A doctor, after
all, is bound by the Hippocratic Oath, not applicable to the jailor, and the
physician's job is to treat illness, not punish the prisoner.  Accordingly,
when a claimant challenges the adequacy of an inmate's treatment, this
Court is deferential to the judgments of medical professionals.  That is not
to say that a doctor is immune from a deliberate indifference claim simply
because he provides some treatment for the inmates' medical needs.  But
there is a high bar that a plaintiff must clear to prove an Eighth
Amendment medical-needs claim:  The doctor must have *consciously*
exposed the patient to an *excessive* risk of *serious* harm.

894 F.3d at 738-39 (emphasis in original) (internal quotation marks and citations

omitted).  The Court assesses the conduct of each of the individual Defendants in

accordance with these standards.

### a.  Defendant Bergman

As noted earlier, Defendant Steven Bergman, D.O., is Defendant Corizon's

regional medical director, and he first became involved in Plaintiff's treatment in

February of 2016, after the second x-ray of Plaintiff's knee.  (*See* Medical Record at 64;

Bergman Dep. at 13.)  Specifically, P.A. Sperling contacted Dr. Bergman to express his

concern that the conservative treatment of Plaintiff's knee "was not working as well as

he would have liked," and these two medical professionals "together" determined that

"the next appropriate step would be to get a[] [second] MRI" of Plaintiff's knee.

(Bergman Dep. at 13, 22-23; *see also* Medical Record at 64.)  Dr. Papendick denied this

request for a follow-up MRI, (*see id.* at 66), but as a result of further communications

between P.A. Sperling and Dr. Bergman, it was determined that Plaintiff would be

transferred to a hospital for inpatient physical therapy, (*see id.* at 39; *see also* Bergman

Dep. at 25-26).

In arguing that this record, viewed in a light most favorable to him, establishes the subjective component of a claim of deliberate indifference against Dr. Bergman, Plaintiff begins with the observation that this health care professional "had access to Plaintiff's entire electronic medical record" and was "required to use evidence-based medicine" in determining an appropriate course of treatment for his knee condition. (Plaintiff's Response Br. at 23.) On this latter point, Plaintiff refers specifically to "UpToDate," an online, computer-based system used by Defendant Corizon Health that gives its health care professionals access to diagnostic criteria and evidence-based testing and treatment recommendations developed by specialists in various fields of medicine. (*See* Bergman Dep. at 9.)[4] In Plaintiff's view, "[t]he specialists at UpToDate provided very clear information on the proper treatment of a torn meniscus and [the] need to get [an] orthopedic consultation," and Dr. Bergman "acknowledged reading" this information but nonetheless "ignored" it in determining how to treat Plaintiff's knee injury. (Plaintiff's Response Br. at 23.) According to Plaintiff, this record demonstrates (i) that Dr. Bergman "had to know" that the conservative treatment of Plaintiff's condition "had been repeatedly shown not to work," and (ii) that he likewise was "aware of the x-rays and MRI reports that showed increasing physical problems related to [Plaintiff's] torn meniscus." (*Id.* at 24.) Nonetheless, Plaintiff contends that Dr. Bergman "ignored

---

[4]As a threshold matter, the Corizon Defendants request that the Court disregard the UpToDate records accompanying Plaintiff's response to their motion, on the ground that Plaintiff purportedly violated his duty to supplement under Fed. R. Civ. P. 26(e)(1)(a) by failing to disclose these records to Defendants within a reasonable time after he obtained them through a third-party subpoena. (*See* Corizon Defendants' Reply Br. at 2-3.) The Court need not resolve this issue, however, in light of its conclusion that the UpToDate records do not assist Plaintiff in satisfying the subjective prong of his claims of deliberate indifference against the three individual Defendants.

the risk" disclosed in this record, and instead "ordered more of the physical therapy that merely caused pain . . . without any medical benefit." (*Id.*)

The Court agrees with the Corizon Defendants that the evidence and arguments put forward by Plaintiff fail on multiple grounds to satisfy the subjective component of the deliberate indifference standard. First, while Plaintiff relies on the UpToDate system to establish a standard of care that Dr. Bergman purportedly violated and "ignored," the Corizon Defendants correctly observe that this claimed standard of care rests upon "cherry-pick[ed] passages from UpToDate." (Corizon Defendants' Reply Br. at 5.) Plaintiff points, for example, to language in UpToDate stating that "[l]arge, complex [meniscal] tears . . . should be referred to an orthopedist without delay," (Plaintiff's Response Br. at 17 (quoting Plaintiff's Response, Ex. 7, UpToDate Records at 8)), yet the record gives no indication that Plaintiff sustained such a "large, complex" tear. Indeed, in the very same portion of UpToDate cited by Plaintiff, it is noted that "[m]eniscal injuries of the knee are quite common," and that "chronic degenerative tears occur in older patients and can occur with minimal twisting or stress." (UpToDate Records at 1.) As noted earlier, Plaintiff was 62 years old at the time of his injury. Moreover, to the extent that Plaintiff relies on the findings from the December 1, 2015 MRI of his knee to demonstrate the need for more aggressive treatment, the UpToDate system emphasizes that "MRI findings must be interpreted cautiously," where "[m]ucinoid degenerative change . . . is a common finding" that reflects "a normal part of the aging process and should not be misinterpreted as a traumatic meniscal tear." (*Id.* at 5.)

The Corizon Defendants further observe that under the UpToDate system, the appropriate treatment for a meniscal tear depends upon the characterization of this injury. In particular, UpToDate states:

> Tears associated with chronic degeneration of the meniscus occur in older patients and may not be associated with an acute injury. Meniscectomy does not appear to help in most such cases, but physical therapy may. The use of physical therapy to treat degenerative meniscal injuries is supported by observational studies showing an association of the condition with diminished quadriceps strength and lower extremity function. However, any meniscal tear that causes persistent effusions or recurrent mechanical dysfunction (eg, locking) warrants referral to an orthopedic surgeon . . . .

> Multiple trials have found surgical treatment for degenerative meniscal tears to be ineffective.

(*Id.* at 10.) Similarly, the Corizon Defendants point to the report of their orthopedic expert, Dr. Drouillard, who opines (i) that the December 2015 MRI "demonstrated a degenerative tear in the medial meniscus," (ii) that this was "a classic description of a chronic, degenerative process," and (iii) that in light of these findings, "[c]ontinued conservative care was reasonable and appropriate." (Drouillard Report at 1.)

As already observed, Plaintiff has not countered Dr. Drouillard's findings with the opinion of another medical expert. Instead, he offers only the assertions of his counsel that the medical record here should have triggered the application of the UpToDate provisions calling for more aggressive treatment of his knee injury. (*See* Plaintiff's Response Br. at 17-18, 23.) Yet, even assuming that equal weight should be given to counsel's non-expert reading of UpToDate's treatment recommendations and the findings and conclusions of Defendants' orthopedic expert, this merely indicates that the record would support differing medical judgments about the proper course of treatment

for Plaintiff's knee condition.  As the Sixth Circuit has explained, where the record "at most raises a simple question of whether [a doctor] made the right medical judgment in treating" an inmate, such a "disagreement with a course of medical treatment does not rise to the level of a federal constitutional claim under the Eighth Amendment." *Rhinehart,* 894 F.3d at 744 (internal quotation marks, alteration, and citations omitted); *see also Estelle,* 429 U.S. at 107, 97 S. Ct. at 293 (observing that "the question whether a[] . . . [particular] form[] of treatment . . . is indicated is a classic example of a matter for medical judgment" which "does not represent cruel and unusual punishment").

Moreover, even if the medical record could be viewed as pointing decisively toward the need for more aggressive treatment, rather than leaving this matter open to differing medical judgments, Plaintiff still must produce evidence from which a trier of fact could conclude (i) that Dr. Bergman "subjectively perceived facts from which to infer substantial risk to" Plaintiff in the absence of this more aggressive treatment, (ii) that he "did in fact draw the inference," and (iii) that he "so recklessly ignored th[is] risk that he was deliberately indifferent to it."  *Rhinehart,* 894 F.3d at 738 (internal quotation marks and citations omitted).  Dr. Bergman's deposition testimony fails to support these propositions, but instead discloses (i) that in February of 2016, he discussed Plaintiff's course of treatment and imaging studies with Plaintiff's primary health care provider, P.A. Sperling, and also reviewed the notes of Plaintiff's visits with P.A. Sperling, (ii) that as a result of this discussion, he and P.A. Sperling agreed that "the next appropriate step" would be to obtain a second MRI of Plaintiff's knee, (iii) that after this request for an MRI was denied, he again communicated with P.A. Sperling and consulted the UpToDate system, and (iv) that he and P.A. Sperling then agreed upon inpatient

physical therapy, in accordance with what they understood as the recommendation of the UpToDate system. (*See* Bergman Dep. at 13-15, 22-23, 25-26.) Plaintiff does not cite any evidence in the record that might undermine or cast doubt on Dr. Bergman's testimony on any of these points, apart from his and his counsel's reading of the UpToDate system as calling for an orthopedic consultation and surgery.

Against this backdrop, Plaintiff's claim of deliberate indifference against Dr. Bergman turns upon the proposition that this medical professional disregarded a known, substantial risk to Plaintiff's health by choosing to recommend that Plaintiff continue a conservative course of treatment rather than embarking upon the more aggressive form of treatment favored by Plaintiff. Yet, the Sixth Circuit has held that where, as here, an inmate's physician "implement[s] a recognized course of treatment" and "continue[s] to monitor" the inmate's condition, the mere existence of an alternate course of treatment is not indicative of the physician's "conscious disregard" for the inmate's medical needs, as necessary to establish a claim of deliberate indifference. *Rhinehart,* 894 F.3d at 744. To be sure, if the form of treatment selected by the physician poses an "obvious" risk to the inmate's health, or if this risk "is well-documented and circumstances suggest that the [physician] has been exposed to information so that he must have known of the risk," a trier of fact may properly conclude that the subjective component of the deliberate indifference standard has been satisfied. *Rhinehart,* 894 F.3d at 738 (internal quotation marks and citation omitted). Here, however, the record contains ample evidence that the decisions made by Dr. Bergman regarding Plaintiff's course of treatment fell comfortably within the boundaries of sound professional judgment, and the courts are "deferential to the judgments of medical professionals." 894 F.3d at 738

(internal quotation marks and citation omitted). Accordingly, the evidence in this case is insufficient as a matter of law to establish the subjective prong of Plaintiff's Eighth Amendment claim against Dr. Bergman.

### b. Defendant Papendick

In the time period of relevance here, Defendant Keith Papendick, M.D. served as the medical director of utilization management for the Michigan division of Defendant Corizon Health. (*See* Papendick Dep. at 8.) In this role, Dr. Papendick evaluated requests by on-site health care providers for particular forms of treatment, and he would either approve these requests or propose an alternative treatment plan. (*See id.* at 11.) In determining whether to approve these requests, Dr. Papendick did not perform clinical examinations of patients, but instead based his decisions on review of the patient's electronic medical record. (*See id.* at 39.)

As recounted earlier in the factual summary of this case, Dr. Papendick evaluated a number of requests submitted on Plaintiff's behalf by his primary health care provider, P.A. Sperling, and he denied several of these requests while approving others. Initially, Dr. Papendick denied P.A. Sperling's July 2, 2015 request that Plaintiff be sent for an orthopedics consultation, and he instead proposed a program of "quadriceps muscle strengthening/toning exercise to treat what is described as Patellofemoral syndrome." (Medical Record at 194-95; *see also id.* at 184-86 (approving P.A. Sperling's subsequent request for evaluation by a physical therapist and development of a home exercise program in accordance with Dr. Papendick's recommendation).) Next, when P.A. Sperling determined following a September 23, 2015 examination that the physical therapy approved by Dr. Papendick had not

significantly improved Plaintiff's condition, he submitted three requests over the next month for an MRI of Plaintiff's knee, (*see id.* at 114, 127, 147), but Dr. Papendick denied each of these requests as not medically necessary, and instead recommended such measures as (i) exercises performed four times a day in the health care unit, (*see id.* at 143), and (ii) "scheduling and restricting NSAIDS and acetaminophen to demonstrate compliance and changing to a different formulary NSAID every 90 days," (*id.* at 126). In response to the last of these three requests, however, Dr. Papendick opined that Plaintiff's knee should be x-rayed before ordering an MRI, (*see id.* at 113), and once this x-ray was performed, Dr. Papendick approved P.A. Sperling's November 9, 2015 request for an MRI, (*see id.* at 103-04).

In the wake of the December 1, 2015 MRI of Plaintiff's knee, Dr. Papendick continued to review requests from P.A. Sperling for additional forms of treatment. For instance, when P.A. Sperling submitted a December 9, 2015 request for an orthopedic consult in light of the MRI's "significant" findings, (*id.* at 93), Dr. Papendick responded by calling P.A. Sperling the next day and asking him to conduct research on a stress fracture revealed in the MRI, (*see id.* at 90). Based on this research, P.A. Sperling determined that Plaintiff should avoid putting weight on his left knee for at least six weeks, and that further measures to address Plaintiff's torn meniscus should not be pursued until the stress fracture had healed. (*See id.*) Following another x-ray of Plaintiff's knee on January 20, 2016, P.A. Sterling consulted with Defendant Bergman and then elected to request a second MRI. (*See id.* at 64.) Dr. Papendick denied this request, and instead reiterated his earlier recommendation that Plaintiff should perform "quad extensor exercises . . . in front of [the] nursing [staff] four times daily." (*Id.* at 66.)

After Plaintiff was transferred to a hospital in April of 2016 for a two-month course of inpatient physical therapy, it was determined that his condition showed "little to no improvement." (*Id.* at 1209.) On July 7, 2016, Dr. Papendick approved a request for an orthopedic surgery consult, (*see id.* at 1209-10), and he likewise approved the recommendation of the consulting orthopedic surgeon, Dr. Ikram, that Plaintiff should undergo arthroscopic surgery, (*see id.* at 1179-80).

In arguing that this record suffices to sustain a finding in his favor on the subjective component of his Eighth Amendment claim against Dr. Papendick, Plaintiff relies on precisely the same reasoning offered in support of his claim against Dr. Bergman. In particular, Plaintiff again notes that Dr. Papendick, like Dr. Bergman, had access to his electronic medical record and the UpToDate system, but he asserts that these two medical professionals "ignored" the recommendations of the UpToDate specialists regarding "the proper treatment of a torn meniscus and [the] need to get [an] orthopedic consultation." (Plaintiff's Response Br. at 23.) Despite their awareness that the "conservative physical therapy" provided to Plaintiff "had been repeatedly shown not to work," Plaintiff maintains that Drs. Papendick and Bergman "both insisted that [he] be tortured with another two months of [inpatient] physical therapy . . . , rather than allow the orthopedic consult that the UpToDate specialists required." (*Id.*) It follows, according to Plaintiff, that Dr. Papendick and Dr. Bergman alike "were aware of facts from which the inference could be drawn" that Plaintiff faced a "substantial risk of serious harm" due to their "refusal to allow an orthopedic consult," but that these medical professionals nonetheless "ignored the risk . . . and ordered more of the [physical] therapy that merely caused pain . . . without any medical benefit." (*Id.* at 24.)

34

Because this is the very same argument offered by Plaintiff in support of his claim against Dr. Bergman, the Court's analysis is largely the same as well. First and foremost, Plaintiff's claims against both Dr. Bergman and Dr. Papendick rest on the common premise that the UpToDate system mandated a course of treatment different from the one adopted by these two physicians. As already discussed, however, the guidance provided by the UpToDate system is not so definitive as Plaintiff suggests, but instead depends upon medical judgments about the proper characterization of Plaintiff's knee injury. The report of the Corizon Defendants' expert, Dr. Drouillard, indicates that the conservative course of treatment chosen by Drs. Papendick and Bergman was consistent with the recommendations of the UpToDate system for degenerative meniscal injuries, and Plaintiff offers only the arguments of his counsel in support of his claim that the UpToDate system mandated more aggressive treatment under the circumstances. As explained earlier, this record suggests, at most, that the choice between a conservative and a more aggressive course of treatment for Plaintiff's knee injury turned upon the exercise of medical judgment, and Plaintiff's bare "disagreement with a course of medical treatment does not rise to the level of a federal constitutional claim under the Eighth Amendment." *Rhinehart,* 894 F.3d at 744.

Apart from this lack of an evidentiary basis for concluding that the denial of more aggressive treatment posed a substantial risk to Plaintiff's health, Plaintiff also fails to point to evidence that would enable a trier of fact to find (i) that Dr. Papendick "subjectively perceived facts from which to infer" that this substantial risk existed, (ii) that "he did in fact draw the inference," and (iii) that "he then disregarded that risk by failing to take reasonable measures to abate it." *Rhinehart,* 894 F.3d at 738 (internal

quotation marks and citations omitted).  In arguing that Dr. Papendick ignored a
"substantial risk of serious harm" by "refus[ing] to allow an orthopedic consult and
instead subject[ing] Plaintiff to" another course of physical therapy that "had already
been shown . . . to cause extreme pain, swelling, and stiffness, without any benefit,"
(Plaintiff's Response Br. at 23), Plaintiff essentially invites the trier of fact to infer that Dr.
Papendick must have acted with the requisite degree of deliberate indifference or
recklessness by virtue of his continued insistence upon a conservative course of
treatment that was not working and, in fact, was exacerbating Plaintiff's condition.  Yet,
the Sixth Circuit has emphasized that "[a] doctor is not liable under the Eighth
Amendment if he or she provides reasonable treatment, even if the outcome of the
treatment is insufficient or even harmful."  *Rhinehart,* 894 F.3d at 738.

To be sure, Plaintiff denies that the course of treatment approved by Dr.
Papendick was "reasonable."  Instead, he maintains that a trier of fact could conclude
otherwise by virtue of (i) the UpToDate system's purported recommendation of a
different, more aggressive form of treatment, and (ii) the evidence in the record
demonstrating that his knee was not improving — but, to the contrary, was arguably
getting worse — as a result of this conservative course of treatment.  As to the first
point, the Court already has rejected Plaintiff's proposed non-expert reading of the
UpToDate system as mandating a different course of treatment.  As for the evidence of
Plaintiff's arguably worsening condition, Plaintiff cites no law for the proposition that a
medical professional's deliberate indifference may be established solely on the basis of
20/20 hindsight that a chosen course of treatment did not work or that a different form of
treatment might have worked better.

To the contrary, this Court must be "deferential to the judgments of medical professionals," and a choice among "forms of treatment" is a "classic example of a matter for medical judgment that does not represent cruel and unusual punishment." *Rhinehart,* 894 F.3d at 738, 744 (internal quotation marks and citations omitted). Although this does not mean that "a doctor is immune from a deliberate indifference claim simply because he provided some treatment for [an inmate's] medical needs," the Court explained earlier that a medical professional's "implement[ation] [of] a recognized form of treatment" and "continued . . . monitoring" of an inmate defeats a showing of "conscious disregard" for the inmate's medical needs. *Rhinehart,* 894 F.3d at 738, 744 (internal quotation marks and citation omitted). As stated earlier with respect to Dr. Bergman, the record in this case amply supports the conclusion that the decisions made by Dr. Papendick were the product of medical judgment and resulted in Plaintiff receiving recognized forms of treatment and regular monitoring of his condition. Although Plaintiff would have preferred that Dr. Papendick had more quickly abandoned a conservative course of treatment and approved more aggressive measures, nothing in the record would permit the inference that his decisions were a product of his conscious disregard of the substantial risk of harm posed to Plaintiff if he failed to approve a more aggressive form of treatment. It follows that Plaintiff cannot establish the subjective component of his Eighth Amendment claim against Dr. Papendick.

### c. Defendant Spreeman

During the time period of relevance here, Defendant Betsy Spreeman, a registered nurse, was the health unit manager at LCF. Ms. Spreeman examined Plaintiff only once, on June 10, 2015, and she reported that Plaintiff had a "bruise like

color on [the] inner part of [his] left knee" but "[m]inimal swelling" and "[n]o decrease in strength." (Medical Record at 206.) Ms. Spreeman testified at her deposition that she decided to examine Plaintiff after receiving a call from his son "expressing some concerns" about the treatment of his knee injury. (Plaintiff's Response, Ex. 6, Spreeman Dep. at 10-11.) Ms. Spreeman further testified that she provided over-the-counter pain medications to Plaintiff during his June 10 visit, advised him to keep his knee elevated, and also fitted him for new crutches because Plaintiff had "destroyed" the pair he brought with him by attempting to modify them in a manner that made them "too high" under the relevant guidelines. (*Id.* at 11-12.) Ms. Spreeman explained to Plaintiff that his crutches were meant to be "supportive" rather than "full weight bearing devices," and that they should reach only "an inch to an inch and a half below the armpit" rather than all the way up to his armpits because longer crutches would "do nerve damage down through [his] arms." (*Id.* at 12.)

Plaintiff offers a different account of his June 10, 2015 visit with Ms. Spreeman. He testified that after his son called Ms. Spreeman several times in early June, she agreed to see him on June 10. (Plaintiff's Dep. at 7-8.) According to Plaintiff, another nurse had measured and adjusted the crutches that he was using when he arrived for his June 10 appointment with Ms. Spreeman, but Ms. Spreeman took those crutches away and substituted a new pair, explaining that he "need[ed] to start putting more weight on" his knee and that the new crutches would assist with this while also "help[ing] with stability." (*Id.* at 18-20.) In Plaintiff's view, the crutches provided by Ms. Spreeman were too short and "a joke," as they reached only "to the bottom of [his] ribs" rather than up near his armpits. (*Id.* at 29-30.) He testified that while using these

crutches, he "had incidents where [his] knee would lock up" and he "would fall." (*Id.* at 29.) Thus, within a week, he exchanged these crutches for a longer pair.

Plaintiff contends that this record gives rise to genuine issues of fact as to the subjective component of his deliberate indifference claim against Defendant Spreeman. He notes that Ms. Spreeman "had access to [his] electronic medical record," (Dkt. 78, Plaintiff's Response Br. at 10), so that it is reasonable to assume that she was aware of P.A. Sperling's determinations at a recent June 2, 2015 visit that (i) Plaintiff was "encouraged to use crutches," and (ii) he was advised against "continued weight bearing" on his left knee, as the knee "need[ed] time to heal [and] bearing weight w[ould] continue to aggr[a]vate it," (Medical Record at 211). Plaintiff also points to Ms. Spreeman's stated awareness that crutches, if properly measured, should reach to an inch or an inch and a half from the armpit. Despite all this, Plaintiff asserts that Ms. Spreeman "dramatically violated [P.A.] Sperling's orders by seizing the appropriately sized crutches that had been provided to [him]" and substituting crutches that were "dramatically too small." (Plaintiff's Response Br. at 10.) These crutches, in turn, "required [Plaintiff] to put weight on his knee every time he walked," and thus reflected Ms. Spreeman's purported instruction that Plaintiff should "put weight on his injured left knee in direct contravention of [P.A.] Sperling's orders." (*Id.*)[5] This record, in Plaintiff's view, establishes that Ms. Spreeman was "subjective[ly] aware[] of the danger of [Plaintiff] putting weight on his injured knee," but that she nonetheless "gave [Plaintiff] a

---

[5]The Court notes that the medical record contradicts Plaintiff's assertion that Ms. Spreeman directed him to put more weight on his knee. Instead, the record indicates that Ms. Spreeman reiterated P.A. Sperling's instructions that Plaintiff should use crutches and remain "nonbearing" on his knee. (Medical Record at 207.)

totally inappropriate set [of crutches] that forced him to walk on his knee, causing three falls in the next week."  (Plaintiff's Response Br. at 11.)

The Court finds that this evidence is insufficient as a matter of law to satisfy the subjective prong of Plaintiff's Eighth Amendment claim against Ms. Spreeman.  As Plaintiff observes, it is reasonable to assume from the record that Ms. Spreeman was aware of P.A. Sperling's recent instruction that Plaintiff should use crutches to avoid putting weight on his injured knee.  Moreover, viewing the record in a light most favorable to Plaintiff, Ms. Spreeman nonetheless took away Plaintiff's properly-sized crutches and substituted a shorter pair, advising him — in contravention to P.A. Sperling's recent instructions — that he "need[ed] to start putting more weight on" his knee.  (Plaintiff's Dep. at 20.)

Yet, even under this reading of the record, Plaintiff offers nothing beyond mere speculation that Ms. Spreeman "*consciously* exposed [him] to an *excessive* risk of *serious* harm," *Rhinehart,* 894 F.3d at 738-39 (internal quotation marks, alteration, and citation omitted) (emphasis in original), by giving him a different pair of crutches and directing him to put more weight on his knee.  Although the record, viewed favorably to Plaintiff, is consistent with the conclusion that Ms. Spreeman disregarded the possibility that Plaintiff might suffer additional pain and harm as a result of her purported instructions to use shorter crutches and put more weight on his knee, a trier of fact could equally well conclude that the changes made by Ms. Spreeman to P.A. Sperling's treatment plan were a product of mere negligence.  Perhaps, as Plaintiff suggests, Ms. Spreeman deliberately gave him crutches that were "dramatically too small," (Plaintiff's Response Br. at 10), and thereby forced him to put weight on his injured knee in a

manner that she knew would inflict pain. Nothing in the record, however, would enable

a trier of fact to choose between that scenario and the possibility that Ms. Spreeman

made a mistake in measuring the crutches, or that she erroneously determined that

Plaintiff's knee could bear somewhat more weight. As the Sixth Circuit has instructed,

evidence of negligence "is not enough to sustain an Eighth Amendment claim," even if it

"produce[s] added anguish," *Santiago,* 734 F.3d at 592 (internal quotation marks and

citations omitted), and Plaintiff's bare "disagreement" with Ms. Spreeman's "medical

judgment" or her selection of a particular "course of medical treatment does not rise to

the level of" deliberate indifference to an inmate's serious medical needs, *Rhinehart,*

894 F.3d at 744 (internal quotation marks and citations omitted). It follows that Plaintiff

cannot satisfy the subjective element of his Eighth Amendment claim against Defendant

Spreeman.

**B.      Absent a Showing of an Underlying Eighth Amendment Violation,
          Plaintiff Cannot Sustain His Claim Against Defendant Corizon Health.**

In Count II of his first amended complaint, Plaintiff charges Defendant Corizon

Health with violating the Eighth Amendment prohibition against cruel and unusual

punishment, alleging that Corizon adopted policies, practices, and procedures that

resulted in the failure of the individual Defendant medical professionals to provide

reasonable treatment for his knee injury. As previously explained, however, the record

fails as a matter of law to establish that any of the individual Defendants acted with

deliberate indifference to Plaintiff's serious medical needs. Absent a showing that his

constitutional rights were violated by one or more of the individual Defendants, Plaintiff

cannot hold Defendant Corizon Health liable under § 1983. *See Blackmore,* 390 F.3d at 900; *Watkins v. City of Battle Creek,* 273 F.3d 682, 687 (6th Cir. 2001).

In any event, the evidence pointed to by Plaintiff fails to provide a basis for imposing § 1983 liability on Defendant Corizon Health. To the extent that his claim against Corizon rests upon a purported "practice of not referring [an inmate] to an outside consultant after months of severe suffering and disability," (Plaintiff's Response Br. at 25), the only evidence Plaintiff offers of such a "practice" is the actions taken by the individual Defendant medical professionals in addressing his specific knee injury. Yet, even assuming one or more of the individual Defendants failed to provide appropriate treatment for this particular injury, "the wrongful conduct of a single [medical provider] without any policy-making authority d[oes] not establish" Corizon's policy or practice of deliberate indifference to the medical needs of inmates. *Collins v. City of Harker Heights,* 503 U.S. 115, 121, 112 S. Ct. 1061, 1066 (1992). Nor may Plaintiff "rely solely on a single [episode] to infer" such an unconstitutional policy or practice. *Thomas v. City of Chattanooga,* 398 F.3d 426, 433 (6th Cir. 2005). Similarly, to the extent that Plaintiff faults Corizon Health for its inaction as health care professionals in its employ provided inadequate treatment for an inmate's knee injury, a policy or practice of condoning such allegedly inadequate health care must rest on evidence of a "clear and persistent pattern of mistreatment of detainees." *Miller,* 408 F.3d at 815; *see also Thomas,* 398 F.3d at 433. Again, Plaintiff relies only on his treatment in this case, and thus cannot establish a pattern of Corizon Health acquiescing in or condoning constitutional violations by its medical staff.

Plaintiff next points to Corizon's alleged policy or practice of deferring to a single individual with "no expertise in orthopedics" — namely, its medical director of utilization management, Dr. Papendick — to make all of its determinations regarding "imaging or outside consultation for serious orthopedic injuries," and to deny such requests for treatment "in opposition go the required 'evidence-based' experts in UpToDate." (Plaintiff's Response Br. at 25.)  Once again, however, as evidence that this alleged policy or practice reflects Corizon's deliberate indifference to the medical needs of inmates, Plaintiff relies exclusively on Dr. Papendick's treatment decisions in his own case.  As already discussed, Plaintiff has failed to show that these decisions were inconsistent with the recommendations of the UpToDate system, much less that they rose to the level of an Eighth Amendment violation.  Consequently, even if Plaintiff were permitted to extrapolate from Dr. Papendick's decisions in this case to a company-wide policy or practice, he cannot establish that this posited Corizon policy or practice reflected the company's deliberate indifference to the medical needs of inmates.

Finally, Plaintiff suggests that Corizon Health is subject to liability under § 1983 for failing to provide training to its medical staff "on how to challenge [Dr.] Papendick's wrongful" denials of requests for medical treatment.  (*Id.*)  Again, this theory of liability rests on a premise that the Court has rejected — namely, that Dr. Papendick acted with deliberate indifference to Plaintiff's serious medical needs by denying certain of the requests for more aggressive treatment of Plaintiff's knee injury.  In any event, to prevail on this failure-to-train theory, a plaintiff ordinarily must produce evidence of "prior instances of unconstitutional conduct demonstrating that the [defendant] has ignored a history of [violations] and was clearly on notice that the training in this particular area

was deficient and likely to cause injury." *Miller v. Sanilac County,* 606 F.3d 240, 255 (6th Cir. 2010) (internal quotation marks and citation omitted).  The record here, however, is limited solely to the treatments received by Plaintiff himself for his knee injury, and thus cannot serve as notice to Corizon of any alleged deficiencies in the training of its medical staff.  Accordingly, Defendant Corizon Health is entitled to summary judgment in its favor on the § 1983 claim asserted against it in Plaintiff's first amended complaint.

## V.    CONCLUSION

For these reasons, the Court **GRANTS** the August 24, 2018 motion for summary judgment filed by Defendants Corizon Health, Inc., Dr. Keith Papendick, and Dr. Bergman (Dkt. 69).  The Court also **GRANTS** the August 28, 2018 motion for summary judgment filed by Defendant Betsy Spreeman (Dkt. 73).

**IT IS SO ORDERED.**


Date: June 6, 2019                                    s/Marianne O. Battani
                                                      MARIANNE O. BATTANI
                                                      United States District Judge